UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
(Northern Division)

| | |
|---|---|
| RILWAN AKINOLA,<br><br>                    Plaintiff,<br><br>       v.<br><br>OFFICER DARRELL LAVIN,<br>AMY STAFFORD-SHROYER, R.N,<br><br>                    Defendants. | Case No. 1:22-CV-00657-DKC<br><br>**JURY TRIAL DEMANDED** |

## [PROPOSED] FIRST AMENDED COMPLAINT

### NATURE OF ACTION

1.     On September 23, 2021, Defendant Correctional Officer Darrell Lavin ordered Plaintiff Rilwan Akinola, then incarcerated at Western Correctional Institution ("WCI"), a Maryland state prison in Cumberland, Maryland, to walk down a slippery steel staircase while Mr. Akinola was handcuffed with his hands behind his back, wet from having taken a shower, and unescorted. Mr. Akinola fell down the stairs and sustained a serious and severely painful injury to his left knee, in addition to other injuries. Defendant Lavin failed to arrange timely medical attention for Mr. Akinola, who languished in excruciating pain for hours. As a result of Defendant Lavin's deliberate indifference to serious risks of harm to Mr. Akinola and to his serious medical needs, Mr. Akinola suffered serious injuries and suffered from needlessly prolonged pain.

2.     Mr. Akinola finally saw Defendant Nurse Amy Stafford-Shroyer, who brushed off Mr. Akinola's injuries and pain. She refused to examine him carefully or to arrange for his examination by a physician and failed to prescribe him sufficient pain medication. She prescribed

only over-the-counter-type pain medication but failed to ensure Mr. Akinola received this medication. He did not, and he did not receive any pain medication or attention from a physician until over a month later, after he had been transferred to Roxbury Correctional Institution ("RCI"), another Maryland state prison.

3. While at RCI, Mr. Akinola was still in severe pain and had difficulty walking. He finally received pain medication and was examined by a physician (including on November 4, 2021). Mr. Akinola's injury required, and he ultimately received, a cane to help him walk, a knee brace, and physical therapy, and examination by an orthopedist. Mr. Akinola ultimately was referred to receive an MRI. Defendant Stafford-Shroyer's earlier deliberate indifference to Mr. Akinola's serious medical needs and failure to prescribe stronger medication or to refer him to an orthopedist, or to any physician, needlessly prolonged Mr. Akinola's suffering from severe pain and his difficulty walking.

4. Accordingly, Mr. Akinola brings this action against Defendant Stafford-Shroyer and Defendant Lavin for compensation for the pain and suffering he needlessly endured and will continue to endure, vindicating his rights under the Eighth Amendment of the United States Constitution to be free of the cruel and unusual punishment inherent in deliberate indifference to serious risks of harm to and serious medical needs of prisoners like him who are entirely dependent upon others for their safety while shackled and for their medical care.

## JURISDICTION AND VENUE

5. This Court has subject matter jurisdiction under 28 U.S.C. § 1331 because Mr. Akinola's claims arise under the Eighth Amendment and the Due Process Clause of the Fourteenth Amendment of the United States Constitution and 42 U.S.C. § 1983. The Court has supplemental jurisdiction over Mr. Akinola's state law claims under 28 U.S.C. § 1367.

6. The District of Maryland is a proper venue under both 28 U.S.C. § 1391(b)(1) & (2)(b) because a substantial part of the events or omissions giving rise to Mr. Akinola's claims occurred in Maryland and because all Defendants reside in Maryland.

## PARTIES

7. Plaintiff Rilwan Akinola is a Maryland resident currently incarcerated at Roxbury Correctional Institution ("RCI"), a prison facility of the State of Maryland Department of Public Safety and Correctional Services ("DPSCS") in Hagerstown, Maryland. From early January 2020 until October 14, 2021, Mr. Akinola was housed at WCI.

8. Defendant Darrell Lavin ("Officer Lavin") was a correctional officer of the rank Correctional Officer II who, at all relevant times, was employed by DPSCS at WCI. He is sued in his individual capacity.

9. Defendant Amy Stafford-Shroyer ("Nurse Stafford-Shroyer") is a registered nurse who, at all relevant times, was employed by Corizon Health ("Corizon") at WCI. At all relevant times, Corizon had a contract with the State of Maryland to provide healthcare to the Maryland prison system, and thereby Corizon and its employees performed official duties and acted under color of law. Defendant Stafford-Shroyer is sued in her individual capacity. At relevant times, Defendant Stafford Shroyer was known as Amy M. Booth.

10. At all relevant times, all Defendants were acting under color of law.

## FACTUAL ALLEGATIONS

**I. Officer Lavin Ordered Mr. Akinola to Walk Down Slippery Stairs Without Escort While Mr. Akinola was Shackled and Wet, in Deliberate Indifference to a Known, Excessive Risk to Mr. Akinola's Health, Safety, and Well-Being**

11. On September 23, 2021, Mr. Akinola was housed at WCI in the segregation housing area.

3

12. DCPCS and WCI policy provided that each shackled inmate should be escorted by an individual officer during transport. Upon information and belief, this policy existed at least in part to protect the safety of inmates, including from risks such as falling while shackled and unable to brace oneself. Mr. Akinola had heard from both officers and inmates about other incidents in which inmates had fallen when, contrary to policy, they were not escorted by an officer during transport. Officer Lavin had worked for the Maryland DPSCS for 30 years and in the segregation housing unit for three years; he was familiar with all governing policies. In particular, he was well aware of the escort policy that required one officer per inmate.

13. At approximately 8:35 a.m. on September 23, 2021, Officer Lavin came to the cell Mr. Akinola shared with Michael Wilson to take Mr. Akinola and Mr. Wilson to the showers, located up a metal staircase.

14. After Officer Lavin handcuffed Mr. Akinola and Mr. Wilson and led them to the upstairs showers, he placed them in the shower unit behind a gate (known as the "grill"). Officer Lavin closed the gate to the shower unit, separating himself from Mr. Akinola and Mr. Wilson (leaving Mr. Akinola and Mr. Wilson inside the shower unit, and Officer Lavin on the outside). Officer Lavin removed Mr. Akinola's and Mr. Wilson's handcuffs through the gate so that they could shower.

15. Mr. Akinola and Mr. Wilson proceeded to shower and to change back into their clothes, including their shoes. All of this took place within the shower unit, so the shoes into which Mr. Akinola changed were wet from the shower.

16. Approximately 5-10 minutes after closing the gate, Officer Lavin returned to cuff Mr. Akinola and Mr. Wilson again before opening the gate. As Officer Lavin approached, Mr. Wilson remarked to Mr. Akinola, "he's coming by himself."

17. Mr. Akinola understood Mr. Wilson's remark to be a reference to the fact that under governing policy and standard practice at WCI, Officer Lavin should have had another officer with him so that each individual inmate received an escorting officer

18. It is the standard practice at WCI to follow the escort policy, and to assign one escorting officer to each shackled inmate during transport, with the officer physically holding and supporting the inmate.

19. Without any other officer present, in violation of the WCI escort policy, Officer Lavin placed both Mr. Akinola and Mr. Wilson in handcuffs once again, with their hands shackled behind their backs. Officer Lavin then caused the grill gate to open via radio command.

20. Realizing that Officer Lavin intended to transport both Mr. Akinola and Mr. Wilson at once—leaving one of them without the required escorting officer—and cognizant of the fact that his feet were wet, he would be shackled, and he would be required to walk down a slick metal staircase while deprived of the use of his arms to support or brace himself—Mr. Akinola thought to himself that an additional officer would provide him assistance with the risky task of walking down the stairs and would provide him with additional safety.

21. Mr. Akinola advised Officer Lavin of his concern and of the escort policy. Mr. Akinola stated to Officer Lavin, "it's only you—where is the other officer at."

22. Officer Lavin, aware of the policy requiring one escort per inmate and having just been reminded by way of Mr. Akinola's concerned query of the policy and of the risk to Mr. Akinola's safety of forcing him to walk with his hands cuffed behind his back down a slick stairway after a shower, deliberately disregarded this risk.

23. Officer Lavin flippantly responded to Mr. Akinola, "you'll be fine," and directed Mr. Akinola to "come out" through the open gate; Officer Lavin backed up this verbal command

with a hand gesture indicating that Mr. Akinola was under orders to walk. In response to Mr. Akinola's mention of the fact that there was no second officer to escort him, Officer Lavin made clear that he was nonetheless ordering Mr. Akinola to walk out of the shower and down the stairs: "I'm giving you a direct order," said Officer Lavin. A distance of roughly five steps separated the staircase from the shower gate.

24. Exiting the shower gate, Mr. Akinola was in front of Mr. Wilson. Officer Lavin took hold of Mr. Wilson to begin escorting him. Mr. Akinola did not have any escort, contrary to policy.

25. Nevertheless, in deliberate indifference to the risk of severe injury to Mr. Akinola, Officer Lavin again commanded Mr. Akinola to walk down the stairs. Officer Lavin repeatedly told Mr. Akinola to "go ahead," which Mr. Akinola understood to mean the only thing it could have: a direct order to walk down the stairs back toward the cell. There was nowhere else for Mr. Akinola to "go."

26. Mr. Akinola had no choice but to follow Officer Lavin's order to walk down the steps. If he did not, he could be subject to punishment.

27. Officer Lavin was moving at a fast pace, and pushing Mr. Wilson—and therefore Mr. Akinola, who was under orders to proceed in front of Mr. Wilson and Officer Lavin—to move at a fast pace toward the stairs. Mr. Akinola observed that Defendant Lavin was rushing, moving the inmates quickly and impatiently. Defendant Lavin was escorting Mr. Wilson so quickly that Mr. Wilson was pushing up against Mr. Akinola's heels, forcing Mr. Akinola onward toward the stairs.  Mr. Wilson told Officer Lavin to slow down because it was wet.  Officer Lavin did not withdraw his order.

28. Mr. Akinola did as he was ordered: he walked down the slick metal stairs.

29. Mr. Akinola's shoes were wet, and the cuffs prevented him from balancing and from grabbing hold of the rail. Predictably, Mr. Akinola took 3-4 steps, slipped, and fell. With his hands shackled behind his back, he could not break this fall. He fell all the way to the bottom of the stairwell—roughly 20 steps.

30. The first part of Mr. Akinola's body to make contact with the hard concrete floor and/or the steel staircase itself was his left knee. When he came to a stop, his knee immediately began to swell up and to cause him severe pain. Mr. Akinola also injured, and felt severe pain in, his shoulders, back, arm, hip, ankle, and leg.

31. Officer Lavin ordered Mr. Akinola to "get up." Mr. Akinola protested: "I'm in pain." Officer Lavin forced him to get up anyway, and exacerbated the pain to Mr. Akinola's injured knee by forcing him to walk (this time escorted by Officer Lavin) to his cell. Mr. Akinola could barely walk, and doing so, even with an escort, exacerbated his existing pain.

32. Mr. Akinola told Officer Lavin that he was in severe pain and needed immediate medical attention. Officer Lavin indicated he would arrange for medical attention but did not return. As minutes turned into hours, Mr. Akinola languished in his cell in constant, excruciating pain, including in his badly swollen knee. During this period, Mr. Akinola's pain was so severe and apparent to his cellmate Mr. Wilson that Mr. Wilson began banging on the door of the cell to get an officer's attention. Officer Lavin returned (an hour or two later) and again said that he would call medical; he "was working on it." Still, Mr. Akinola waited. Mr. Akinola waited for at least three to four hours between his injury and receiving attention from a nurse.

**II.    Nurse Stafford-Shroyer Refused to Provide Necessary Care**

33. Finally, Officer Lavin took Mr. Akinola to see Nurse Stafford-Shroyer in a room within the segregation unit. He was not taken to the prison medical area, which was outside the segregation unit.

7

34. Mr. Akinola described his symptoms to Nurse Stafford-Shroyer, including his excruciating pain, his badly swollen knee, and the fact that he could barely walk. At this point, Mr. Akinola had been suffering in pain for at least 3-4 hours.

35. But Nurse Stafford-Shroyer refused to carefully examine the injured areas of Mr. Akinola's body, including the severe swelling of his knee and his bruising. Mr. Akinola requested to be examined and to be seen by a physician, because his knee was in severe pain and was swollen. Nurse Stafford-Shroyer refused. Instead, she told Mr. Akinola he would be okay because he was a young, big guy. Mr. Akinola reiterated that he was in severe pain and again requested to be seen by a doctor, to no avail.

36. Given the swelling, pain, and difficulty walking Mr. Akinola reported to Nurse Stafford-Shroyer, she knew—particularly in light of her training and experience as a registered nurse—that Mr. Akinola was suffering from a serious knee injury.

37. But Nurse Stafford-Shroyer disregarded this serious medical need, and neither undertook more than a cursory examination herself nor referred Mr. Akinola to a physician for examination. After repeated pleas from Mr. Akinola, Nurse Stafford-Shroyer said that she would refer Mr. Akinola to a physician, but she never did so.

38. Instead of receiving an examination or a referral to a physician, Mr. Akinola was taken back to his cell, and remained in severe, untreated pain for weeks. Mr. Akinola suffered excruciating pain and untreated inflammation of his knee, and severe pain in his back and left arm. He had trouble walking, difficulty standing for long periods of time, and experienced swelling and sharp pains.

### III. Nurse Stafford-Shroyer Failed to Ensure Mr. Akinola Received Prescribed Pain Medication

39. The only action Nurse Stafford-Shroyer *did* take on September 23, 2021 in response to Mr. Akinola's report of excruciating pain and inability to walk was to prescribe over-the-counter pain medication—acetaminophen or ibuprofen—and muscle rub. In fact, Mr. Akinola's pain was so severe that he needed stronger pain medication.

40. Nurse Stafford-Shroyer prescribed methyl salicylate/menthol (muscle rub) in 15%-10% cream and "pain relief" in 325 mg tablets. Upon information and belief, the term "pain relief" referred to acetaminophen.

41. But Nurse Stafford-Shroyer failed to provide Mr. Akinola with the pain medication she had prescribed. Mr. Akinola did not receive any medication at all in connection with his injuries from the fall while he resided at WCI. On information and belief, Nurse Stafford Shroyer, knowing of Mr. Akinola's severe pain and other symptoms, and knowing that he had not received the medication weeks after she prescribed it, did not follow up to ensure that he received the medication she had prescribed.

42. On or about September 26-27, 2021, Mr. Akinola submitted a sick call slip reporting the fact that he had not received any medication. Nurse Stafford-Shroyer signed this slip. Still, he received no medication. Nor did he receive a further medical visit or any further medical attention at WCI. And he continued to suffer in severe pain.

43. Under normal practice and policy, Mr. Akinola was required to sign for medication he received.

44. Despite undertaking to provide him care, acknowledging that his pain and other symptoms warranted pain medication, and undertaking to provide that medication, Nurse Stafford-Shroyer did not take the steps necessary to ensure that Mr. Akinola in fact received that medication.

Even after receiving express notice via Mr. Akinola's sick call slip of the fact that Mr. Akinola still had not received any medication days after she first undertook to prescribe it, Nurse Stafford-Shroyer deliberately disregarded the fact that Mr. Akinola was still in severe pain and failed to take steps necessary to provide him with needed medication.

45.     All the while, Mr. Akinola continued to suffer excruciating pain and inflammation of his knee, and severe pain in his back and left arm. He had trouble walking, difficulty standing for long periods of time, and experienced swelling and sharp pains.

46.     Mr. Akinola exhausted his administrative remedies regarding both Officer Lavin's conduct causing Mr. Akinola's fall and the continued delay and lack of medical treatment for his resulting injuries.

## IV.    After Being Transferred Away from WCI and Nurse Stafford-Shroyer's Care, Mr. Akinola Received Medical Attention and Treatment

47.     On October 14, 2021, Mr. Akinola was transferred from WCI to RCI. At RCI, he continued to seek medical attention by writing sick call slips. Finally, two weeks after Mr. Akinola's arrival at RCI, he saw a nurse and a physician.

48.     The RCI medical staff did some of what Nurse Stafford-Shroyer should have done but failed to do: responded to Mr. Akinola's pain by providing him with treatment. RCI staff prescribed ibuprofen and muscle rub—even over a month after the fall, Mr. Akinola was still in severe pain. On November 4, 2021, they also prescribed a course of naproxen for pain. Yet Mr. Akinola's pain persisted. On December 8, 2021, he received prescriptions for glucosamine and indomethacin. Indomethacin is a prescription-only medication for pain. Unlike Nurse-Stafford-Shroyer, the RCI staff actually ensured Mr. Akinola received this medication as prescribed.

49.     RCI medical staff also prescribed Mr. Akinola a walking cane and knee brace.

50. An RCI doctor referred Mr. Akinola to an orthopedist. Mr. Akinola saw the orthopedist on June 9, 2022.

51. The orthopedist concluded that Mr. Akinola required physical therapy regarding his knee injury.

52. Mr. Akinola was transferred to a prison facility in Baltimore on July 24, 2022. Finally, on or about September 8, 2022, Mr. Akinola was permitted to begin a course of physical therapy.

53. In sessions over the course of September and October 2022—over a year after Mr. Akinola initially presented his symptoms to Nurse Stafford-Shroyer—the physical therapist noted that Mr. Akinola reported suffering throbbing left knee pain as high as levels 7 and 8 out of 10, was stiff and sore, and had an observable limp.

54. On October 7, 2022—over a year after Mr. Akinola's injury—the physical therapist recommended additional diagnostic testing for Mr. Akinola's knee in order to assess the possibility of structural damage. Mr. Akinola did not receive testing at that time.

55. In March 2023, Mr. Akinola was transferred to Dorsey Run Correctional Facility. There, a nurse prescribed additional physical therapy and diagnostic tests.

56. Eventually Mr. Akinola received a referral for an MRI of his knee.

57. To this day, Mr. Akinola suffers from pain in his left knee and in his back. The pain has steadily increased since his September 2021 fall. He faces difficulty walking. At the age of 41, he must use a cane to walk.

58. Earlier and more appropriate medication and treatment, including physical therapy, earlier receipt of over-the-counter pain medication and stronger pain medication, diagnostic testing, and treatment resulting from such testing would have mitigated Mr. Akinola's ongoing

pain and disability. The effects of Officer Lavin's and Nurse Stafford Shroyer's actions and omissions were to cause Mr. Akinola's injury, needlessly to prolong his pain, suffering, and disability, and to deprive him of earlier treatment intervention that would have mitigated the disability he suffers today.

## CLAIMS FOR RELIEF

### Count 1
### (Against Defendant Lavin)
### Eighth Amendment of U.S. Constitution and 42 U.S.C. § 1983

59. Mr. Akinola incorporates by references paragraphs 1 through 58.

60. Defendant Lavin acted with deliberate indifference to serious risks of harm to Mr. Akinola.

61. Being ordered to walk down a roughly 20-step wet metal staircase in wet shoes, with both hands cuffed behind his back, and without an officer escort exposed Mr. Akinola to a serious risk of harm, namely falling down the steps while unable to use his arms to break his fall and sustaining serious bodily injury.

62. Defendant Lavin had actual knowledge that Mr. Akinola faced a serious risk of harm from walking down a roughly 20-step metal staircase while wet, with both hands cuffed behind his back, and without an officer escort.

63. Defendant Lavin disregarded and acted with deliberate indifference to and reckless disregard of the serious risk to Mr. Akinola's health, safety, and well-being by affirmatively ordering and prodding Mr. Akinola to walk down the stairs while wet, shackled, and unescorted, which constituted an unreasonable response to this known risk.

64. Defendant Lavin's deliberate indifference and reckless disregard caused Mr. Akinola to fall down roughly 20 stairs and suffer serious physical and mental injuries, which

included excruciating pain in his knee; difficulty walking and standing; and severe pain in his knee, leg, arm, and back.

65. Defendant Lavin also acted with deliberate indifference and reckless disregard to Mr. Akinola's serious medical needs.

66. Mr. Akinola's injuries, including to his left knee, left arm, shoulders, and back, and symptoms of those injuries, including difficulty walking and excruciating pain, sustained on September 23, 2021 were each serious medical needs that required immediate and timely medical attention and pain medication.

67. Defendant Lavin had actual knowledge that Mr. Akinola suffered serious medical needs. Defendant Lavin witnessed Mr. Akinola's fall down a metal staircase that cause the injuries; Mr. Akinola directly told Officer Lavin that he was in pain and needed immediate medical attention; and Officer Lavin recognized that Mr. Akinola could not walk unaided when he escorted Mr. Akinola back to his cell.

68. Defendant Lavin knew that Mr. Akinola faced a substantial and excessive risk of harm, including remaining in severe, untreated pain, if he did not receive proper care, including immediate and timely medical attention and pain medication.

69. Even though Defendant Lavin knew that Mr. Akinola suffered from serious medical needs, including severe untreated pain, Defendant Lavin disregarded and acted with deliberate indifference and reckless disregard to the substantial and excessive risks to Mr. Akinola's health and well-being. Defendant Lavin did not take steps necessary to ensure that Mr. Akinola received the immediate and timely medical attention and pain medication he needed. There was no medical or penological purpose for failing to ensure that Mr. Akinola received the required immediate care.

70. Defendant Lavin's recklessness and deliberate indifference both caused Mr. Akinola's injury and prolonged his suffering in severe, untreated pain and inflammation for hours longer than was necessary.

71. Defendant Lavin acted under color of law because he worked for the State of Maryland, Department of Public Safety and Correctional Services, and acted or purported to act in furtherance of his official duties.

## Count 2
### (Against Defendant Lavin)
### Gross Negligence

72. Mr. Akinola incorporates by references paragraphs 1 through 58.

73. Defendant Lavin owed Mr. Akinola a manifest duty to use reasonable care not to harm Mr. Akinola or to violate his rights. Defendant Lavin, as a correctional officer responsible for the custody of Mr. Akinola, further owed Mr. Akinola a duty to protect him against physical harm and to ensure his safety.

74. Defendant Lavin intentionally, with actual malice, and with reckless indifference to the risk of harm to Mr. Akinola failed to perform these duties and breached these duties in a grossly negligent manner by, among other things:

   a. Affirmatively ordering and prodding Mr. Akinola to walk down a metal staircase while wet, with his hands shackled behind his back, and unescorted, knowingly in violation of WCI policies and practices and having been advised of the risks by Mr. Akinola and Mr. Wilson;

   b. Refusing and failing to take steps necessary to ensure that Mr. Akinola received the immediate and timely medical attention and pain medication he needed after sustaining serious and severely painful injuries from falling down a roughly 20-stair metal staircase,

such that Mr. Akinola did not receive any medical attention until at least 3-4 hours after he sustained his injuries.

75. Defendant Lavin took these actions, failing to perform his manifest duties to Mr. Akinola, in wanton and reckless disregard for and utter indifference to the consequences to Mr. Akinola and his well-being and to his rights, and with thoughtless disregard for those consequences without exerting any effort to avoid them.

76. As a direct and proximate cause of Defendant Lavin's reckless, malicious conduct, Mr. Akinola has suffered, and will continue to suffer, significant and permanent personal injuries and damages.

## Count 3
### (Against Defendant Stafford-Shroyer)
### Eighth Amendment of U.S. Constitution and 42 U.S.C. § 1983

77. Mr. Akinola incorporates by references paragraphs 1 through 58.

78. Defendant Stafford-Shroyer acted with deliberate indifference to Mr. Akinola's serious medical needs.

79. Mr. Akinola's injuries, including to his left knee, left arm, shoulders, and back, and symptoms of those injuries, including difficulty walking and excruciating pain, sustained on September 23, 2021 were each serious medical needs that required physical examination, evaluation and care by physicians and specialists, physical therapy, diagnostic tests, and sufficient pain medication.

80. Defendant Stafford-Shroyer had actual knowledge that Mr. Akinola suffered serious injuries and serious medical needs, which was evident through Mr. Akinola's repeated statements to Defendant Stafford-Shroyer and in his sick call slips.

81. Defendant Stafford-Shroyer knew that Mr. Akinola faced a substantial and excessive risk of harm if he did not receive proper care, including proper medication, physical

15

examination, and evaluation and care by physicians and specialists, including physical therapy and diagnostic tests.

82. Defendant Stafford-Shroyer knew from her own decision to prescribe Mr. Akinola pain medication and from his subsequent sick call slip that he had been prescribed pain medication, yet was not receiving it, and therefore remained in severe, untreated pain.

83. Even though Defendant Stafford-Shroyer knew that Mr. Akinola suffered from serious medical needs, she disregarded and acted with deliberate indifference to the substantial and excessive risks to his health and well-being by delaying and failing to provide the necessary care, including physical examination, evaluation and care by physicians and specialists, physical therapy, and diagnostic tests, and by failing to furnish Mr. Akinola with sufficiently strong pain medication and failing to ensure Mr. Akinola was furnished with pain medication prescribed to him. There was no medical purpose for these actions.

84. The deliberate indifference of Defendant Stafford-Shroyer caused Mr. Akinola to suffer physical and mental injuries. Defendant Stafford-Shroyer prolonged Mr. Akinola's suffering, which included excruciating pain in his knee that remained untreated until well over a month after his injury; difficulty walking and standing, and severe pain in his knee, leg, arm, and back. As a result of the delay in medication, physician examination, specialist examination, and physical therapy, Mr. Akinola continues to experience pain in his back and left knee, and continues to require the assistance of a cane to walk.

85. Defendant Stafford-Shroyer acted under color of law because she worked for Corizon, which had a contract with the State of Maryland to provide healthcare to the Maryland prison system, and thereby acted or purported to act in furtherance official duties.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays that the Court enter judgment for Plaintiff against Defendants and grant:

A. Compensatory damages in an amount to be proven at trial;

B. Punitive damages as allowed by law;

C. Attorneys' fees and costs under 42 U.S.C. § 1988; and

D. Other such relief at law or in equity to which he is entitled or which the Court concludes is just and proper.

**DEMAND FOR TRIAL BY JURY**

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Mr. Akinola demands a trial by jury on all issues and claims.


Dated: September 13, 2024            Respectfully submitted,

/s/ Ben Jernigan
J. Benjamin Jernigan (admitted *pro hac vice*)
Zuckerman Spaeder LLP
1800 M Street, NW, Suite 1000
Washington, DC 20036
Tel.: (202) 778-1800
Fax: (202) 822-8106
E-mail: bjernigan@zuckerman.com

/s/ Martin S. Himeles, Jr.
Martin S. Himeles, Jr. (Bar No. 03430)
Zuckerman Spaeder LLP
100 East Pratt St., Suite 2440
Baltimore, MD 21202-1031
Tel.: (410) 778-1800
Fax: (410) 659-0436
E-mail: mhimeles@zuckerman.com

*Attorneys for Plaintiff Rilwan Akinola*